UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**RANDY L. CURRIE,**          Chapter 11
    Debtor          Case No. 11-13502-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**MEMORANDUM**

**I. INTRODUCTION**

The matters before the Court are the Motions of the Newburyport Five Cents Savings Bank (the "Bank") for Relief from the Automatic Stay. The Bank filed its first Motion on November 17, 2011 and its second on March 2, 2012. The Bank, the holder of a first mortgage on the principal residence of Randy L. Currie (the "Debtor"), seeks authority to foreclose on the Debtor's residence pursuant to 11 U.S.C. § 362(d)(1) and (d)(2).[1] The Debtor opposed both Motions. The Court conducted an evidentiary hearing on March 8, 2012 with respect to whether the Debtor's property located at 111 Georgetown

---

[1] Pursuant to 11 U.S.C. § 1123(b)(5), the Debtor may not modify the Bank's rights as a holder of a secured claim as that claim is secured "by a security interest in real property that is the debtor's principal residence."

1

Road, West Newbury, Massachusetts (the "West Newbury property") is necessary to an effective reorganization. The Debtor was the only witness and the parties submitted no exhibits into evidence. With the assent of the parties, the Court reviewed the "U.S. Trustee Basic Monthly Operating Reports," which the Debtor, as a debtor-in-possession, is required to submit to the U.S. trustee, for the months of November, 2011, December, 2011 and January, 2012. Based upon the record of proceedings, the testimony of the Debtor and a review of Chapter 11 plans and disclosure statements filed by the Debtor, the Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.

**II. FACTS**

The Debtor filed a Chapter 13 petition on April 18, 2011. He failed to disclose on his petition his prior Chapter 13 case, which he commenced on February 10, 2011, and which he voluntarily dismissed on March 31, 2011.[2]

On May 11, 2011, the Debtor filed Schedules of Assets and Liabilities and a Statement of Financial Affairs.[3] On Schedule A-Real Property, the Debtor disclosed a fee simple interest in the West Newbury property, which he valued at $431,636 and which he disclosed was subject to secured claims totaling $421,678. The Debtor also listed an interest in property located at 6 New Pasture Road, Newburyport, Massachusetts (the

---

[2] The Debtor amended his petition to reflect the prior filing on June 28, 2011.

[3] The Court may take judicial notice of the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999), *cert. denied,* 530 U.S. 1230 (2000); In re Hyde, 334 B.R. 506, 508 n.2 (Bankr. D. Mass. 2005).

"Newburyport property"). He described his interest as arising out of his status as a trustee and beneficiary of the R & R Realty Trust.

On Schedule B-Personal Property, the Debtor listed stock and interests in a corporation known as R.. L. Currie Corporation ("corp also d/b/a 'The Shred Source', 'The Truck Fixer' and 'Store It Mass.'"), although he did not disclose any interest in Diversified Capital Management Inc., a corporation listed in his Statement of Financial Affairs as an entity in which he had an interest within six years preceding the commencement of his case.[4] The Debtor indicated that he is the "100% shareholder and all Officers and directors," of R.L. Currie Corporation and ascribed a $-0- current value to his ownership interest.

On Schedule D-Creditors Holding Secured Claims, the Debtor listed the Bank as the holder of a first mortgage on the West Newbury property in the sum of $155,604 and "City Ntl Bk" as the holder of a second mortgage on the West Newbury property in the amount of $222,111, as well as a tax lien and a judicial lien affecting the West Newbury property. On Schedule E-Creditors Holding Unsecured Priority Claims, the Debtor listed the Department of Revenue as the holder of a $24,000 claim arising from "corporate fuel tax."[5]

---

[4] The Debtor provided no cogent information about Diversified Capital Management, Inc., although it is both co-plaintiff with the Debtor in an action against G/J Towing and Gennaro Aguillo and co-defendant with the Debtor in an action brought by Pawnee Leasing Corporation.

[5] The Debtor provided for a tax claim in the sum of approximately $2,400 in his First Amended Chapter 11 plan, but did not mention this claim anywhere in his plan. The claims register does not reflect that the Massachusetts Department of Revenue filed a proof of claim for this obligation.

On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor listed numerous creditors holding claims in excess of $400,000, including a $100,000 criminal restitution claim.[6]

On Schedules I and J-Current Income of Individual Debtor(s), the Debtor disclosed income of $2,166.67 from his employer of four years, DCM Group, Inc., as well as monthly income from his wages from R.L. Currie Corporation of $4,772.23, and social security disability income received by his non-debtor spouse and minor child in the sum of approximately $1,700. On Schedule J-Current Expenditures of Individual Debtor(s), the Debtor listed expenses of $6,146.

In his Statement of Financial Affairs, the Debtor disclosed income of approximately $26,000 for both 2009 and 2010. Additionally, in his Statement of Financial Affairs, the Debtor disclosed a number of civil actions pending in various state courts, including an arbitration proceeding involving a dispute with his brother, Richard Currie, with respect to the Newburyport property.

On May 13, 2011, the Debtor filed an "Application for Order Authorizing Debtor to Employ Counsel as Trial Counsel on a State Court Arbitration Case without Retainer" in which he sought authority to employ Attorney Anthony M. Metaxas of Metaxas, Brown, and Pidgeon, LLP of Beverly, Massachusetts "to perform all of the services necessary and

---

[6] On Schedule F, the Debtor disclosed numerous claims held by the "Department of Education/nein" [sic] which were last active on January 17, 2011; a disputed and contingent claim held by Richard Currie in the sum of $150,000, as well as a claim for past due legal fees in the sum of $2,000 owed to Debtor's counsel's law firm.

4

desirable in representing him in the pending Arbitration case until concluded." On the same day, the Debtor assented to a Motion to Obtain Relief from Stay filed by Richard Currie in which the Debtor's brother sought relief from stay to pursue pending civil actions as well as a Complaint to Vacate or Modify the Arbitrator's Award, pending in the Suffolk Superior Court, Department of the Trial Court, captioned Richard Currie v. Randy L. Currie, Individually and as Trustee of R & R Realty Trust, Renee Currie, William Currie, Diversified Capital Management, Inc. (Case No. 10-4404G). According to Richard Currie, R.C. Recycling, Inc. is a defendant and party in interest in that action. Additionally, on May 13, 2011, the Debtor applied for authority to employ his bankruptcy counsel as trial counsel in a matter pending in the Suffolk Superior Court, Department of the Trial Court, captioned Diversified Capital Management Inc, Randy Currie, et al. vs G/J Towing, Inc., Genarro Angiulo, et al, ( SUCV 2006-04267), in which the Debtor is seeking approximately $300,000.[7]

On July 1, 2011, the Debtor amended Schedule E to add a real estate tax claim held by the Town of West Newbury in the sum of $5,702.61 and the criminal restitution claim in the sum of $100,000 held by the Commonwealth of Massachusetts. A few days later, he

---

[7] Debtor's counsel stated: "Attorney Shapiro is willing to act on Debtor's behalf and to be compensated only in the event of an affirmative recovery by the Debtor. Thus, the Debtor will only be obligated to pay Attorney Shapiro in the event the results of this matter is [sic] a finding in favor of the Debtor and results in available funds due and payable to the Debtor."  Attorney Shapiro did not reference the prepetition claim in the sum of $2,000 in that Application or the Application for Order Authorizing Debtor-in-Possession to Employ Counsel under General Retainer in which he represented he received a $6,000 retainer on October 27, 2011.

moved to amend Schedules B, C, and I. On amended Schedule B, he listed the current value of R.L. Currie Corporation at $51,000; on amend Schedule I, he increased the amount of his monthly wages from R.L. Currie Corporation from $4,772.23 to $5,648.

While his Chapter 13 case was pending, the Debtor filed an objection to the Bank's proof of claim[8] and the Bank and other creditors filed objections to Debtor's Chapter 13 plan and First Amended Chapter 13 plan, filed on May 11, 2011 and July 8, 2011, respectively. On October 24, 2011, the Debtor moved to convert his Chapter 13 case to a case under Chapter 11 on the ground that his secured debt exceeded the limits imposed by 11 U.S.C. § 109(e). The Court granted the Debtor's motion the next day.

On November 2, 2011, the Debtor moved for authority to use cash collateral. In his Motion, he represented the following:

> The debtor has recently confirmed title to his commercial property, in a complex arbitration case filed against the debtor by his brother regarding a valuable piece of commercial property at which the debtor operated his truck repair business. Because of the arbitration case in which the debtor's brother claimed to be 50% owner of the property and claimed that the mortgage and promissory note owed to the predecessor of Bayview Loan Servicing (hereafter "Bayview") was illegal and unauthorized, the debtor stopped paying its first mortgage to Bayview Loan Servicing and listed in his Chapter 13 petition that the debtor's obligation to repay was uncertain as to that loan. Bayview stopped making efforts to collect payments from either the debtor or his brother on their loan and the Debtor stopped making payments, thus causing the debtor to fall behind allegedly in the sum of about $350,000.00.

\*\*\*

---

[8] The Bank filed an amended proof of claim on March 2, 2012 in which it indicated that the amount of its arrearage at the commencement of the Debtor's case was $40,240.59 and that its total claim was $219,679.64 as of February 29, 2012.

6

> However, the debtor and his wife also own their home at 111 Georgetown Road, West Newbury . . . a single family non-income producing principal residence occupied by the debtor, his wife, and his small child with cerebral palsy. The debtor has received an independent appraisal of this residence of $431,636.00 as of around February, 2011; it may be worth less now. The first mortgage upon this W. Newbury property is owed to Newburyport Five Cent Savings Bank allegedly in the amount of about $182,600.00, but the debtor had objected to their proof of claim. The debtor expects he will be able to resolve the objections, now that he is Chapter 11. There is no UCC filing or assignment of rents recorded by Newburyport Five Cent Savings Bank. (A second mortgage upon W. Newbury is owed to Ocwen [sic] with a balance of about $ 212,000.00, which is partially unsecured). . . . .

The Court authorized the Debtor's use of cash collateral on an interim basis.

On November 14, 2011, HSBC Bank USA, N.A., as trustee for the registered holders of Renaissance Home Equity Loan Trust 2006-1 and/or its successors and assigns moved for relief from stay as the holder of a second mortgage on the West Newbury property. It alleged that its second mortgage was in default, that the sum of $303,000 was due and owing, that the Debtor had made no payments since the filing of his case, that $13,289.43 was due for the postpetition period, that a prepetition arrearage of $72,2996.36 existed, that the total of all liens and encumbrances equaled $529,571.67, and that there was no equity in the property in view of the $431,636 value ascribed to the West Newbury property by the Debtor. Shortly thereafter, on November 17, 2011, the Bank also filed a Motion for Relief from the Automatic Stay in which it represented that the Debtor's postpetition arrearage was $21,607.02, that his prepetition arrearage was $40,240.59, that unpaid real estate taxes of $9,925.13 were outstanding, and that the Debtor had no equity in the West Newbury property.

On December 5, 2011, the Debtor filed amended Schedules I and J, increasing his wages from R.L. Currie Corporation to $7,802.92, an increase of $3,030.69 in eight months from May 11, 2011. On Schedule J, he listed monthly net income of $2,199.

On December 15, 2011, the Debtor and HSBC Bank reported that the Debtor had submitted a loan modification request and asked that HSBC Bank's Motion for Relief from Stay be continued. With respect to the Bank's Motion, the Court scheduled an evidentiary hearing as to the Debtor's ability to cure the outstanding arrearage and maintain monthly payments to the Bank for December 28, 2011 at 1:00 p.m. The Court further ordered the Debtor to maintain monthly payments pending further order of the Court, failing which the Court would allow the Bank's Motion for Relief from Stay upon the filing of an affidavit of non-compliance with the order by the Bank.

On December 28, 2011, the Bank filed the Affidavit of Kimberley A. Foulkes, a Senior Vice President at the Bank ("Ms. Foulkes"), in which she attested to the fact that the Debtor had made one partial payment to the Bank on December 24, 2011 in the sum of $2,650, although he had been ordered to make regular monthly payments of principal, interest and real estate taxes. On the same day, however, the parties reported a Stipulation pursuant to which the Debtor acknowledged a prepetition arrearage of $40,240.59, acknowledged postpetition arrearagaes of $27,135.25, excluding arrearages for insurance, attorneys' fees, and other expenses incurred by the Bank, agreed to make regular monthly mortgage payments, withdrew his objection to the Bank's proof of claim, and consented to the entry of an order granting the Bank relief from the automatic stay upon the filing of an affidavit

8

by a Bank officer attesting that payment had not been received.

Although the Debtor successfully modified his second mortgage loan with HSBC Bank, he failed to make timely payments to the Bank pursuant to the Stipulation in both January and February 2012. The Bank filed affidavits of Ms. Foulkes establishing the Debtor's noncompliance with the Stipulation on January 5, 2012 and, again, on January 11, 2012. The Bank filed its second "Motion for Relief from the Automatic Stay due to Debtor's Failure to Maintain Monthly Payments" on March 2, 2012. The Debtor advanced as reasons for his failure to comply with the Stipulation his wife's illness and the holidays, as well as confusion over the amount of the payment due as a result of his receipt of an escrow statement from the Bank.

The Court finds, based upon 1) the Debtor's Stipulation with HSBC Bank, which sets forth a new principal balance due under the note and second mortgage of $222,1111.82; 2) the Bank's uncontested proof of claim; 3) the amount of the tax lien on the West Newbury Property in the approximate sum of $10,000; and 4) the Debtor's admission in his First Amended Plan of Reorganization, that the Debtor lacks equity in the West Newbury property.[9] *See* In re SW Boston Hotel Venture, LLC, 449 B.R. 156, 177 (Bankr. D. Mass. 2001) (citing Stewart v. Gurley, 745 F.2d 1194 (9th Cir. 1984); In re Jug End of the Berkshires, Inc., 46 B.R. 892, 901 (Bankr. D. Mass.1985) ("The majority view . . . defines equity as the

---

[9] At trial, the Debtor implied that the West Newbury property is more valuable than the appraisal submitted by the Bank, but he provided no basis for that opinion other than his personal belief that a house on his street which recently sold $450,000 was not as valuable as his home.

difference between the property value and the total amount of liens against it."). Thus, as noted above, the evidentiary hearing held on March 8, 2012 concerned whether the collateral - - the West Newbury property - - was necessary to an effective reorganization that is in prospect, *see* United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375-76 (1988) ("What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. This means, as many lower courts, including the en banc court in this case, have properly said, that there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'").

The Debtor testified that as a result of the arbitration proceeding he is in control of the Newburyport property. Nevertheless, in his Amended Disclosure Statement, the Debtor indicated :

> In a decision dated October 5, 2010, the arbitrator awarded the debtor, Randy Currie, the entire property and awarded him damages for various related business transactions exceeding the value of Richard's interest of about $56,000.00.
>
> *Richard appealed, but, as of September, 2011, trial counsel for the Debtor determined that these appeals are likely to be denied.*

(emphasis supplied). Accordingly, the Debtor's principal source of income, rents and revenue from business operations at the Newburyport property, including his own, are subject to some uncertainty.

The Debtor testified that four businesses occupy the Newburyport property as tenants at will and that R. L. Currie Corporation also utilizes space in the building for its

10

business endeavors. He testified that he collects $2,525 per month from his tenants. He indicated that his income from Compass Auto Works is $7,500 per week, that his income from his shredding business is $500-800 per week, and that he makes $800-$1,000 per week from the sale of motor vehicles.

The Debtor, referring to bank deposits, testified that he made deposits totaling $57,000 in December, $66,000 in January and $37,000 in February, which he described as a slow month. Despite this positive picture, the Debtor's Operating Reports filed with the U.S. trustee revealed a profit of $399 for November 2011; a loss of $2,870 for December, 2011, and a loss of $3,552 for January 2012. In addition, although the Debtor indicated on Schedule I that he is employed by DCM Group, Inc., the Debtor did not mention his employer during his testimony or set forth that income in his five year projections filed with the Court in conjunction with his First Amended Chapter 11 plan.[10]

The Debtor testified that R.L. Currie Corporation had no employees and that it conducted its business using two subcontractors who earn $800 to $1,000 per week. The Debtor's testimony was at odds with his five year business projections for R.L. Currie Corporation which had a line for labor in the amount of $205,000 per year for the first year of the Debtor's plan of reorganization.

The Debtor testified that he anticipated earning an annual salary of approximately $75,000 and touted his experience managing three, unidentified, multi-million dollar

---

[10] The Debtor did not introduce or refer to the projections at trial. The Court takes judicial notice of the projections which were filed on March 8, 2012.

businesses. The Debtor did not testify about when he operated those businesses, the types of businesses he managed, or the reasons he no longer operates those businesses. Moreover, the Debtor could not remember whether R.L. Currie Corporation operated at a profit or a loss in 2011. Thus, the Court finds that the Debtor's testimony about R.L. Currie Corporation's earning potential is doubtful, a conclusion buttressed by the additional findings set forth below.

The Debtor testified that he is required to make the following monthly payments: $4,150 per month to Bayview Loan Servicing, LLC, the holder of a first mortgagee on the Newburyport property; $3,200 per month to the Bank; and $1,100 per month to HSBC Bank. In addition, he stated that he has personal household expenses of $1,100 per month. In addition to his monthly mortgage payments, the Debtor indicated that he could satisfy the $100,000 restitution obligation. He admitted that he is obligated to satisfy that obligation in full in 2013 and, if he fails to do so, he could be incarcerated.

The Debtor admitted that the U.S.Trustee's Operating Reports for December and January established that his businesses were not operating profitably. Indeed, in his Amended Disclosure Statement he stated:

> The Debtor estimates that on the Effective Date the funds to be distributed shall be $850.00 for real estate taxes, $2238 for the DOR, and $2500 for general unsecured creditors as the initial dividends. In addition, payments for the first mortgage of $3100.00 and second mortgage on his home ($1,100.00) [TOTAL: $ 4,100.00] and to the first mortgage on his commercial property of $4,150.00. The Debtor has sufficient cash of $13,838.00 on hand to make the payments required on the Effective Date, to be transferred to the Debtor's DIP account by R.L. Currie Corp. While the Debtor has recently been showing a short-fall in his DIP account, (due to a doubling of payments in

one month) this account will be funded more carefully by R.L. Currie Corp in the future; at this time, the DIP account has approximately $2,300.00 after payment of all bills by the Debtor.

Although the Debtor did not submit his plan of reorganization into evidence, for purposes of establishing that the First Amended Plan is feasible, the Debtor relies upon five-year projections which show projected annual income of $74,730 for 2012, $281,065 for 2013, $340,990 for 2014, $483,310 for 2015, and $764,850 for 2016. In addition, he represented that he can sell the assets of R.L. Currie Corporation, which he estimates are worth $163,000 (a value $120,000 greater than the value ascribed to the corporation on amended Schedule B), or use funds from the successful outcome of his civil actions against Richard Currie or G/J Towing. He stated:

> Further, the debtor has two potential defendants from which he is expecting a recovery. First, he has a lawsuit pending against G/J Towing for about $300,000 in oil deliveries. This week, the Suffolk Superior Court assigned this matter for a "final pre-trial conference" on March 29, 2012. The trial has been delayed because Debtor's counsel has been unable to locate a key witness who lives in Maine; letters rogatory have already issued to force the witness to appear. This witness was located, with reasonable certainty, this week and Debtor's counsel hopes to depose her in the next few weeks, so that this matter can be tried in the next few months. The Debtor expects to prevail. G/J Towing is owned by the son of the somewhat well-known Gennaro Angiulo, now deceased; G/J Towing is a very busy and substantial towing company, with contracts with almost every city and town in Eastern Massachusetts, which should not be difficult to collect from, if the Debtor prevails in this case.
>
> The second case is against Richard Currie, the brother of Randy Currie. The Debtor believes he owns property and has ability to repay the approximately now $75,000 the Debtor recovered in the arbitration. Trial counsel has been handling matter and has expressed confidence in being able to collect, when the case is finally disposed of.

13

The Debtor's First Amended Plan of Reorganization references administrative claims and attorneys' fees arising in the bankruptcy case and out of the litigation involving the Newburyport property and the claim against G/J Towing. The attorneys' fees are in excess of $50,000. The Debtor also admits that there is a tax claim in the sum of $2,400. The Debtor indicated that he intended to pay the restitution claim from the proceeds of his claim against G/J Towing or from a recovery against his brother, whose ability to satisfy any judgment was not discussed.

### III. DISCUSSION

The Court finds that the Debtor has failed to satisfy his burden of establishing that a plan of reorganization is in prospect. In In re SW Boston Hotel Venture, LLC, 449 B.R. 156 (Bankr. D. Mass. 2011), this Court, citing Timbers, observed:

> To satisfy its burden, a Chapter 11 debtor need not show that its plan of reorganization is confirmable; rather it must establish that its proposed plan has a realistic chance of being confirmed and is not patently unconfirmable. See In re YL West 87th Holdings I LLC, 423 B.R. 421, 444 (Bankr. S.D.N.Y. 2010); In re Mullock, 404 B.R. 800, 806 (Bankr. E.D. Pa. 2009) (To demonstrate that there is a reasonable possibility of successfully reorganizing within reasonable period of time, a debtor must show only that confirmation of plan is within realm of possibility). See also In re Thornwood Assocs., 161 B.R. 367, 368 (Bankr. M.D.Pa.), aff'd, 162 B.R. 438 (M.D. Pa.1993).
>
> The determination as to whether a debtor's prospects for successfully reorganizing are sufficient to preclude entry of an order granting a motion for relief from the automatic stay cannot be mechanistic. As the court in In re Brian Wise Trucking, Inc., 386 B.R. 215 (Bankr.N.D.Ind.2008), recognized:
>
>> Some reorganizations might be relatively simple, requiring nothing more than restructuring debts to creditors in order to overcome temporary cash flow problems. Others will be more complicated and can involve identifying and closing down

14

> unprofitable lines of business, in order to focus on more profitable operations, renegotiating contracts, seeking third party financing, and negotiating with large numbers of creditors. Thus, depending upon the debtor and what it needs to do in order to reorganize its affairs, a successful reorganization can, quite reasonably, be a matter of only a few months, or several years, or anywhere in between. In other words, as much as one might like to be able to lay out precise road maps and timetables which say that by a particular point in time, a debtor must be able to demonstrate thus and so with a particular degree of precision, it is not possible to do so. Instead, what § 362(d)(2) calls for is much more of a discretionary inquiry, rather than a mechanical one, which, at bottom, requires the court to make a judgment call as to whether the debtor is making sufficient progress towards a sufficiently realistic goal such that its efforts should be allowed to continue.

386 B.R. at 219. Courts have developed a list of requirements that a debtor must show in order to meet its burden under the second prong of § 362(d):

> 1. The debtor must be moving meaningfully to propose a plan;
>
> 2. The plan must provide that the lender's allowed secured claim would be valued and payable from the debtor's net operating income generated by its property or the ability to propose a plan based on the infusion of new capital, sale, or other viable means;
>
> 3. The plan must have a realistic chance of confirmation;
>
> 4. Without deciding the issue with the same scrutiny as a confirmation hearing, the debtor's proposed plan must not be obviously unconfirmable;
>
> 5. The reorganization must occur in a reasonable period of time. In this regard the factors to look at are:
>
>> a. the negotiations among the parties;
>>
>> b. the amount of time that the debtor has been in

> possession and operating the business;
>
> c. the length of time since the expiration of the exclusivity period.
>
> In re Building 62 Ltd. P'ship, 132 B.R. 219, 222 (Bankr. D. Mass.1991) (quoting In re Ashgrove Apartments of DeKalb County Ltd., 121 B.R. 752 (Bankr. S.D.Ohio 1990)). The list is illustrative, not exhaustive, and the factors are meant to provide an outline of considerations. Id.

In re SW Boston Hotel Venture , LLC, 449 B.R. at 178-79.

Applying the foregoing principles, the Court finds that the Debtor did not prove by a preponderance of the evidence that a plan is in prospect. Indeed, the Debtor's testimony was vague and overly optimistic. Although the Debtor did not ask the Court to review his plan of reorganization, the Court examined the record of proceedings to assist it in evaluating whether the plan proposed by the Debtor is confirmable.

The Debtor, in effect, has now filed a fourth plan. He filed two Chapter 13 plans which garnered significant objections, and he has now proposed his First Amended Chapter 11 plan.[11]

The Court finds that the Debtor's First Amended Plan does not have a realistic chance of confirmation. The Debtor's track record with respect to his obligation to make regular monthly mortgage payments to the Bank is abysmal under the circumstances, his

---

[11] The Disclosure Statement that accompanied the Debtor's plan filed on February 6, 2012 elicited sustainable objections from the U.S. trustee, the Bank and Bayview Loan Services, LLC. Although the Debtor filed his First Amended Chapter 13 plan on March 8, 2012, he filed a "Response of Debtor to Opposition by U.S. Trustee to First Amended Plan and Disclosures and Expedited Motion for Leave to File Third Amended Plan, Etc." on March 15, 2012.

testimony was vague and devoid of any substance, and the record of proceedings in the case offer no basis for believing that the Debtor would be able to achieve the five year projections filed in support of his First Amended Chapter 11 plan. During the period of time within which the Debtor has been in bankruptcy, he has repeatedly increased his statements of his monthly income, yet he has not been able to timely make his monthly mortgage payment to the Bank and the Operating Reports filed with the U.S. trustee belie any ability to make all mortgage payments and tax payments *and* satisfy the restitution order. In that regard, the Debtor did not testify to, or present any reasons other, than conclusory statements, that he will succeed in his litigation and be able to collect any judgments which he might obtain.

The evidentiary hearing which this Court conducted on March 8, 2012 was the time for the Debtor to demonstrate how he was going to obtain confirmation of a plan of reorganization. He failed to make the requisite showing. While the Debtor engaged the services of counsel to pursue litigation, he failed to employ an accountant to correlate the income and expenses of R.L. Currie Corporation and his personal income and expenses, leaving a confusing impression of his ability to service debt, with all hallmarks of a moving target. Moreover, the Debtor never explained his relationship with DCM Group, Inc., his employer, and why he is paid by that entity while simultaneously juggling three businesses with the services of only two subcontractors.

In addition, the Debtor's First Amended Plan and his proposed treatment of the Bank's secured claim is speculative. The Debtor's plan is predicated upon the success of

litigation and, if necessary, the sale of the Debtor's West Newbury property to satisfy arrearages to the Bank or the sale of the assets of R.L. Currie Corporation, whose value has never been fully analyzed by the Debtor either in his testimony or in his plan.

In short, the Court finds that the Debtor's testimony as well as his First Amended Disclosure Statement and First Amended Plan of Reorganization raise as many questions as they answer and compel the conclusion that the Debtor failed to sustain his burden of proof under 11 U.S.C. § 362(d)(2).

## IV. CONCLUSION

In view of the foregoing, the Court shall enter an order granting the Motion of the Newburyport Five Cents Savings Bank for Relief from the Automatic Stay filed on March 2, 2012 under 11 U.S.C. § 362(d)(2).

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: March 16, 2012